HAWLEY AVENUE ASSOCIATES, LLC *v.* ROBERT
D. RUSSO, M.D. AND ASSOCIATES
RADIOLOGY, P.C.
(AC 32452)

Lavine, Bear and Espinosa, Js.

Argued May 17—officially released August 23, 2011

*James A. Lenes*, for the appellant (plaintiff).

*Robert D. Russo*, for the appellee (defendant).

*Opinion*

LAVINE, J. This case arises from an action brought by the plaintiff, Hawley Avenue Associates, LLC, for the recovery of unpaid rent allegedly due from the defendant, Robert D. Russo, M.D. & Associates Radiology, P.C. The plaintiff appeals from the judgment of the trial court rendered, after a trial to the court, in favor of the defendant. On appeal, the plaintiff claims

that the court (1) improperly concluded that the parties did not enter into an enforceable lease agreement, (2) failed to find that, under Connecticut law, covenants of a commercial lease are deemed to be independent so that a breach of one covenant by a landlord does not suspend the obligation of the tenant to pay the agreed upon rent and (3) erroneously concluded that the plaintiff had terminated the lease. We disagree with the plaintiff, and, accordingly, affirm the judgment of the court.

The following facts and procedural history are relevant to this appeal. On or about February 5, 2002, the parties signed a written lease (lease) for the defendant's use and occupancy of the property located at 63 Hawley Avenue in Bridgeport (property). The term of the lease was for fifteen years and commenced on February 1, 2002. Importantly, the lease contained a provision that allowed the defendant and its employees to park their vehicles on the property. Specifically, paragraph 32.03 of the lease provided in relevant part: "The [l]essee shall have the right to park in the parking lot immediately in front of the demise[d] premises, which shall be reserved for [l]essee's use. Lessee shall have the right and option to construct a fence around said parking area [fifty-five] feet by [thirty-five] feet existing from the entrance to the building . . . ."

Sometime in 2004, the plaintiff constructed its own fence on the property to prevent illegal dumping that had been occurring at the property. On June 9, 2005, the defendant, through its attorney, notified the plaintiff that it was unable to park its vehicles on the property because of the fence and that the fence had been constructed around the parking area described in paragraph 32.03 of the lease.[1] The defendant's attorney also

---

[1] Both parties were represented by the same law firm, Quatrella & Rizio, LLC, concerning the execution of the lease and for matters arising after the execution. The exhibits reflect that the attorney representing the defendant sent notification of the parking issue directly to the plaintiff.

sent letters to the plaintiff dated July 21, 2005, November 28, 2007, and August 21, 2008, complaining about the fence.

In December, 2008, the defendant abandoned the property, claiming that the plaintiff breached the lease by failing to correct the parking situation. In January, 2009, the parties executed a surrender agreement, and the plaintiff took possession of the property.

The plaintiff commenced this action alleging, inter alia, that, pursuant to the lease, the defendant owed it unpaid rent from December 1, 2008, and thereafter. Specifically, the plaintiff alleged that "the defendant agreed to make monthly payments of fixed rent as follows: (1) $3195.96 per month from February 1, 2002 through January 31, 2007; (2) $3777.04 per month from February 1, 2007 through January 31, 2012; and, [3] $4358.13 per month from February 1, 2012 through January 31, 2017 . . . ." In addition to the fixed rent, the plaintiff alleged that the defendant also agreed to pay additional rent in the form of monthly payments for utilities and a share of the real property taxes. The plaintiff further alleged that the defendant failed to pay the fixed rent on December 1, 2008, and thereafter, and failed to pay the additional rent due on February 1, 2009, and thereafter, and, consequently, owed the plaintiff $405,015.32 in fixed rent and $102,083.33 in additional rent.[2] In its answer to the complaint, the defendant asserted, as a special defense, that the plaintiff is barred from recovery of the unpaid rent due to the plaintiff's failure to grant it access to the parking area described in the lease.

At trial, Robert D. Russo, the president of the defendant, testified about his decision to sign the lease and

[2] The plaintiff also alleged that the defendant violated the lease by causing damage to the property when it removed high bay lighting, improperly installed an exhaust vent and performed improper and substandard internal construction.

his understanding as to the location of the parking area described in paragraph 32.03 of the lease. Russo testified that he wanted to rent the property because it provided the defendant with warehouse space for the storage of medical records, equipment and old X ray films, it was in close proximity to one of the defendant's other offices and it offered the defendant the ability to secure the parking area. Russo also testified that the ability to fence in the parking lot was integral to his decision to sign the lease. Finally, Russo testified that he would not have rented the property if he could not fence in the parking lot because "the issue in [his] practice is security. [Ninety-five percent] of my workforce is female and we've had two instances, years ago, of females being attacked, one of them in a file system, and one of them in the office, so security is a big issue with us."

As to the location of the parking area described in paragraph 32.03 of the lease, Russo testified that he believed that the parking area surrounded the pedestrian entrance to the property. Russo testified that he measured the parking area by walking off a box consisting of fifty-five feet by thirty-five feet from the pedestrian entrance to the property, located several feet to the right of the loading ramp. Russo wanted the fence by the pedestrian entrance "because [he] needed . . . the ability to come inside the gate [and] lock the gate before [going] into the building."

Scott Polatsek, the plaintiff's managing member, testified that at the time he signed the lease on behalf of the plaintiff, he understood that the parking area described in the lease consisted of an area surrounding the ramp leading to the loading dock at the property because the defendant "had vans that would come in periodically, maybe, in the night, and they wanted a safe entrance and a safe exit." To support his interpretation of the lease, Polatsek noted a drawing attached to

the lease that showed an area of thirty-five feet by fifty-five feet around the ramp.[3] Russo testified, however, that he had not seen this map until it was produced as part of the discovery process for this action.

In a memorandum of decision dated June 17, 2010, the court found that, because the parties both believed that the lease permitted the defendant to park its vehicles and construct a fence in different areas of the property, "there is a misunderstanding between the parties and a misapprehension by one or both so that their minds have never met." The court also found that "the parties did not even agree on how the parking area would be shaped." Finally, the court found that the parking provision was an "integral part of the lease." Accordingly, the court concluded that the parties never entered into a valid contract, thereby relieving the defendant of any obligations under the lease. This appeal followed.

"A lease is a contract." (Internal quotation marks omitted.) *Warner Associates* v. *Logan*, 50 Conn. App. 90, 94, 718 A.2d 48 (1998). "The existence of a contract is a question of fact to be determined by the trier on the basis of all of the evidence. . . . On appeal, our review is limited to a determination of whether the trier's findings are clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine

---

[3] Two copies of the lease were admitted into evidence at trial. Exhibit A contained a copy of the map referenced by Polatsek in his testimony. Exhibit B did not contain a map of the property but did contain additional language in paragraph 32.03. This language provided: "ownership of said fencing shall revert to [l]essor at the expiration or termination of this [l]ease. Lessee shall be responsible for the maintenance and repair of said fencing."

whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Harley* v. *Indian Spring Land Co.*, 123 Conn. App. 800, 813, 3 A.3d 992 (2010).

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Reid* v. *Landsberger*, 123 Conn. App. 260, 267, 1 A.3d 1149 (2010).

"In order for an enforceable contract to exist, the court must find that the parties' minds had truly met. . . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make. . . . [A]n agreement must be definite and certain as to its terms and requirements." (Internal quotation marks omitted.) *Tsionis* v. *Martens*, 116 Conn. App. 568, 577, 976 A.2d 53 (2009). "[N]umerous Connecticut cases require definite agreement on the essential terms of an enforceable agreement. . . . [Furthermore] [w]hether a term is essential turns on the particular circumstances of each case." (Citation omitted; internal quotation marks omitted.) *Coady* v. *Martin*, 65 Conn. App. 758, 766, 784 A.2d 897 (2001), cert. denied, 259 Conn. 905, 789 A.2d 993 (2002).

There was evidence in the record to support the court's conclusion that the parties did not enter into a

valid contract because there was a misunderstanding as to the location and shape of the parking area described in paragraph 32.03 of the lease. Both Russo and Polatsek testified as to their initial understanding of the location for the parking area. Russo believed that the lease referred to an area surrounding the pedestrian entrance to the property while Polatsek believed that the lease referred to an area surrounding the ramp to the loading dock. Polatsek relied on a map of the property that he claimed was attached to the lease to support his claim that paragraph 32.03 only guaranteed the defendant's employees the right to park and construct a fence in an area near the ramp to the loading dock. There was evidence, however, that Russo had not seen this map before signing the lease.

Additionally, there was evidence in the record to support the court's conclusion that the parking clause was an integral part of the lease and that Russo would not have signed the lease on behalf of the defendant had he known that the parking area did not surround the pedestrian entrance. Russo testified specifically that the ability to fence in the parking lot was integral to his decision to sign the lease because some of the defendant's employees had been "attacked" in the past. Russo believed that the lease allowed him to fence in the area surrounding the pedestrian entrance to provide protection for the defendant's employees. Furthermore, the court found credible Russo's testimony that he would not have signed the lease had he seen the map Polatsek referenced during his testimony. "[W]e are mindful of the well trodden notion that the trial court is the sole arbiter of credibility, [and it is] free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *Shaulson* v. *Shaulson*, 125 Conn. App. 734, 742–43, 9 A.3d 782 (2010), cert. denied, 300 Conn. 912, 13 A.3d 1102 (2011). Because there is evidence that the parties

never agreed on the precise location and shape of the parking area described in paragraph 32.03 of the lease, and that the benefits provided by paragraph 32.03 were an integral part of Russo's decision to sign the lease, we conclude that the court's finding was not clearly erroneous.

The plaintiff argues that the court improperly concluded that the parties never entered into a valid contract for several reasons. First, the plaintiff claims that the defendant made a judicial admission,[4] in its answer to the complaint, that it entered into an enforceable contract with the plaintiff. We decline to address this claim by the plaintiff because the issue of whether the defendant made a judicial admission in its answer was not raised at trial.

"We have repeatedly held that this court will not consider claimed errors on the part of the trial court unless it appears on the record that the question was distinctly raised at trial and was ruled upon and decided by the court adversely to the appellant's claim. . . . [T]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *Williams* v. *Hartford Hospital*, 122 Conn. App. 597, 601 n.2, 1 A.3d 130 (2010).

To challenge the court's decision based on the claim that the defendant made a judicial admission in its answer to the complaint, the plaintiff first was required

---

[4] "Judicial admissions are voluntary and knowing concessions of fact by a party or a party's attorney occurring during judicial proceedings. . . . They excuse the other party from the necessity of presenting evidence on the fact admitted and are conclusive on the party making them. . . . The statement relied on as a binding admission [however] must be clear, deliberate and unequivocal." (Internal quotation marks omitted.) *McFarland* v. *Dept. of Developmental Services*, 115 Conn. App. 306, 317, 971 A.2d 853, cert. denied, 293 Conn. 919, 979 A.2d 490 (2009).

to raise its claim in the trial court. If the plaintiff had chosen to raise its claim for the first time after the court's decision, one way for it to do so would have been by way of a motion for reargument. "[T]he purpose of a reargument is . . . to demonstrate to the court that there is some decision or some principle of law which would have a controlling effect, and which has been overlooked, or that there has been a misapprehension of facts." (Internal quotation marks omitted.) *Jaser* v. *Jaser*, 37 Conn. App. 194, 202, 655 A.2d 790 (1995). Reargument also "may be used to address alleged inconsistencies in the trial court's memorandum of decision as well as claims of law that the [movant] claimed were not addressed by the court." (Internal quotation marks omitted.) *Opoku* v. *Grant*, 63 Conn. App. 686, 692, 778 A.2d 981 (2001). The plaintiff did not raise this claim during trial or, subsequently, in a motion for reargument, and, accordingly, we will not review it for the first time on appeal.

Second, the plaintiff argues that the defendant failed to allege a special defense asserting the lack of an enforceable contract. Specifically, the plaintiff argues that "[i]f the defendant wished to claim that the lease was not enforceable, it was required to plead such in a special defense." We conclude, however, that the issue of whether the parties created an enforceable contract properly was before the court.

In its complaint, the plaintiff alleges that the defendant breached the lease by failing to pay the agreed upon rent. "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Chiulli* v. *Zola*, 97 Conn. App. 699, 706–707, 905 A.2d 1236 (2006). In resolving the claim raised by the plaintiff, therefore, it was necessary for the court first to conclude that the parties entered into an agreement. See

generally *Miller* v. *Guimaraes*, 78 Conn. App. 760, 773, 829 A.2d 422 (2003) (existence of contract between parties is necessary antecedent to any claim of breach of duty of good faith and fair dealing). Without first determining whether the parties entered into a valid agreement, the court could not reach a decision as to whether there was a breach of the lease by the defendant.

Next, the plaintiff argues that the parties had a "meeting of the minds on all lease provisions" because they were represented by the same law firm during the negotiation and execution of the lease. The plaintiff does not cite any cases in its brief to this court that stand for the proposition that when the same law firm represents two different parties during the negotiation and execution of a contract, a "meeting of the minds" necessarily must be inferred. Instead, the plaintiff relies on *Prisco* v. *Westgate Entertainment, Inc.*, 799 F. Sup. 266 (D. Conn. 1992). That case, however, has no relevance to the plaintiff's argument. In *Prisco*, Westgate Entertainment (Westgate) moved to have the law firm of Slavitt, Connery and Vardamis (firm) disqualified from representing Westgate's former partners in an action that was adverse to Westgate's interests. Id., 268. The court noted that one of the firm's lawyers served as general counsel to a limited partnership named Titanic Ventures and that Westgate previously had been a general partner of Titanic Ventures. Id. The court then granted Westgate's motion to disqualify concluding that the firm could not represent Westgate's former partners pursuant to rule 1.9 of the Rules of Professional Conduct because one of the firm's lawyers had represented Westgate in a substantially related matter. Id., 272.

Although *Prisco* addresses impermissible conduct under rule 1.9 of the Rules of Professional Conduct, a rule which is not at issue in the present case, it is silent as to whether a "meeting of the minds" necessarily

must be inferred when the same law firm represents two different parties during the negotiation and execution of a contract. The issue of contract formation is not addressed at all by the court in *Prisco*. The plaintiff, therefore, has not provided us with any authority to support his claim. We conclude that the plaintiff's claim that the parties' minds met because they were represented by the same law firm concerning the execution of the contract is unpersuasive.

Finally, the plaintiff argues that the court improperly concluded that the parties never entered into a valid contract because both parties acted as though they had entered into an enforceable lease for six years. Again, the plaintiff has cited no cases in his brief to this court that support his argument. We also conclude that the parties' actions tend to support the court's view that there was no meeting of the minds concerning paragraph 32.03. Although the defendant paid rent for the use of the property from February, 2002, until December, 2008, the evidence indicates that there was a dispute between the parties as to the location of the parking area described in paragraph 32.03 of the lease as early as June, 2005. The defendant's attorney also notified the plaintiff of the defendant's objection to the fence on four separate occasions between 2005 and 2008, yet the plaintiff did not remove the fence.[5] As to the parking provision of the lease, therefore, the parties acted as though they were operating under two different leases.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[5] Because we conclude that the court properly determined that the parties did not enter into a valid commercial lease agreement, we do not need to address the plaintiff's remaining claims.